IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STRATEGIC ENERGY INCOME
FUND III, L.P.,

               Plaintiff,

v.                                      Case No. 6:16-cv-01033-JTM

STEPHENS ENERGY GROUP, LLC;
ALAMEDA OILFIELD SERVICES
TRUST, Created under the Donald C.
Slawson Irrevocable GST Trust;
SLAWSON EXPLORATION
COMPANY, INC.; and
MBI OIL AND GAS, LLC,

               Defendants.

**MEMORANDUM AND ORDER**

This lawsuit concerns a company that was formed for the purpose of developing a gas pipeline. Plaintiff Strategic Energy Income Fund III, L.P. (hereinafter "SEIF") was a member of the company. In a nutshell, SEIF claims that the defendants cheated SEIF out of an option to purchase the interests of other company members before those interests were sold to defendant Stephens Energy Group, LLC ("Stephens"). The matter is now before the court on the defendants' motions to dismiss. (Dkts. 21, 23, 25).

**I. Summary of the Complaint.**

The lawsuit relates to development of a pipeline to service oil and gas leases in the Nemaha Ridge Project area in Logan County, Oklahoma. Defendant Slawson Exploration ("Slawson") was a working interest owner and the operator of a number of

wells in the project area pursuant to a Participation Agreement and Joint Operating Agreement. Osage Exploration ("Osage") and U.S. Energy Development, Inc. ("U.S. Energy") held shares of the working interest and were also signatories to the agreement. U.S. Energy is the general partner of plaintiff SEIF.

According to SEIF, in 2012 Slawson executed gas purchase agreements with Energy Financial & Physical, LP ("EFP"), in which EFP agreed to market the gas produced from Slawson-operated leases in the Nemaha Ridge Project area. EFP was initially able to use two existing pipelines to move production from the field to processing plants. Slawson planned to expand its drilling program, however, and the anticipated increase in production meant Slawson would need to find or develop additional transportation.

The agreed-upon solution to this problem was two-fold. Slawson would first enter into a ten-year gas purchase agreement with EFP. Then Slawson and the other working interest owners would construct and own a gas gathering pipeline to move the increased production to an Enable Midstream Partners ("Enable") gathering system and processing plant in Canadian County, Oklahoma. Enable would not spend the considerable sum needed to connect to the pipeline unless EFP had a long-term gas purchase agreement in place with Slawson, which would allow Enable to recoup its investment over time.

In January 2013, SEIF, together with defendants Alameda Oilfield Services Trust ("Alameda") and MBI Oil and Gas, LLC ("MBI"), formed Nemaha Gas Gathering Systems, LLC ("Nemaha Gas"), for the primary purpose of building the 30-mile

pipeline needed to service Slawson production from the Nemaha Ridge Project acreage. Slawson drafted the Operating Agreement. SEIF, Alameda, and MBI were designated as members of Nemaha Gas. Slawson was designated as the Pipeline Operator.

The Nemaha Gas Operating Agreement provides each member with a Right of First Refusal giving it an opportunity to purchase another member's interest on the same terms offered by any third-party purchaser. The Agreement defines a default to include selling or attempting to sell a membership interest other than in accordance with the Agreement. It also provides that certain actions require unanimous approval of the non-defaulting members, including adding or substituting members.

The working interest owners of the Project Area gas wells, or their marketing agent (including Slawson and EFP) subsequently entered into gas gathering agreements with Nemaha Gas, under which they agreed to ship, and Nemaha Gas agreed to gather, 100% of the gas produced within the Nemaha Ridge Project area.

On April 1, 2013, Slawson executed an agreement with EFP confirming a 10-year Gas Purchase Agreement in which Slawson agreed to sell all of the Slawson production through May of 2023. This long-term commitment satisfied Enable's requirement for spending the sums necessary to connect its facility to the Nemaha Gas pipeline. EFP in turn entered into a ten-year Gas Gathering Agreement with Nemaha Gas to transport the Slawson production through the new Nemaha Gas pipeline to Enable's facilities.

**<u>Stephens' attempt to become a member</u>**.

On July 24, 2014, Slawson entered into a Purchase and Sale Agreement in which defendant Stephens agreed to buy Slawson's working interest in the leases within the Nemaha Ridge Project area.

On August 8, 2014, Alameda and MBI entered into a Membership Interest Purchase Agreement ("MIPA") with Stephens in which Stephens agreed to buy their membership interests in Nemaha Gas. On August 12, 2014, Nemaha Gas notified SEIF of the proposed sale. On September 10, 2014, SEIF exercised its Right of First Refusal and notified Alameda that it would buy Alameda and MBI's interests on the same terms and conditions offered by Stephens in the MIPA. SEIF deposited $500,000 earnest money with Alameda pursuant to that agreement.

The terms and conditions of the MIPA with Stephens included representations by Alameda and MBI that there had been no adverse changes in Nemaha Gas or its prospects since June 30, 2014, and that from the date of the agreement until closing, Nemaha Gas would not take certain actions without consent of the buyer, including permitting a default on any material contract or engaging in any activity that would be inconsistent with the representations of Alameda and MBI or the undertaking of the parties. Alameda and MBI further represented that through the date of closing, they would cause Nemaha Gas's business "to be operated only in the ordinary course and only in a manner consistent with past practices." The MIPA lists the EFP-Nemaha Gas Gathering Agreement in a schedule of material contracts.

In a joint letter dated September 17, 2014, Slawson and Stephens, according to SEIF, wrongfully directed EFP to cancel the long-term Slawson-EFP Gas Purchase Contract. EFP refused, but Slawson and Stephens nevertheless "took action to effectively cancel" the agreement. Dkt. 1 at 10. Stephens then filed suit against EFP in U.S. District Court for the Western District of Oklahoma ("the EFP lawsuit") seeking a determination that the Slawson-EFP Gas Purchase Contract had been terminated. EFP counterclaimed.

U.S. Energy and SEIF were not notified of this effective cancellation until the day before SEIF was to close on its purchase of Alameda and MBI's interests. The cancellation, according to SEIF, "nullified the EFP-Nemaha Gas Gathering Agreement and effectively damaged the value of the Pipeline owned by Nemaha Gas to such an extent that SEIF was not able to close on its Right of First Refusal." *Id*. at 11. SEIF contends this was done to stop it from purchasing Alameda's and MBI's interests. According to SEIF, Slawson falsely claimed the cancellation was due to concerns that the Gas Purchase Contract could expose Stephens and other working interest owners to liability for underpayment of royalties. SEIF claims it was done to deceive SEIF and to provide cover for efforts to derail SEIF's exercise of the Right of First Refusal. SEIF contends the cancellation of the Slawson-EFP Gas Purchase Contract diminished the value of the Nemaha Gas Pipeline and caused SEIF to lose out on opportunities to profitably sell interests in Nemaha Gas.

**Well Operator Litigation**.

As part of Stephens' purchase of Slawson's working interests, Slawson purportedly assigned its status as Well Operator of the Nemaha Ridge Project leases to Stephens. Osage and U.S. Energy refused to recognize this assignment and asserted that Osage was the Well Operator pursuant to an election under the Joint Operating Agreement. Stephens nevertheless assumed operations, and a lawsuit ensued. On August 25, 2015, the U.S. District Court for the Western District of Oklahoma entered a judgment declaring Osage to be the duly-elected successor to Slawson and enjoining Stephens from functioning as Well Operator.

Stephens nevertheless refused to transfer operations to Osage. Osage resigned shortly thereafter, triggering another election. This time U.S. Energy was elected. Stephens allegedly represented to U.S. Energy that it was in the process of transferring operations, but Stephens lobbied pooled working interest owners in proceedings before the Oklahoma Commission Corporation (OCC) in an effort to collaterally attack the August 25 judgment and be appointed Well Operator by the OCC.

Stephens filed a motion asking the District Court for the Western District of Oklahoma to modify its August 25 judgment to reflect U.S. Energy's election, but also asking for a stay allowing Stephens to continue as operator pending appeal. On October 30, 2015, the Western District entered a new judgment which declared U.S. Energy to be Well Operator, denied Stephens' request for a stay, and directed Stephens to turn over operations to U.S. Energy.

Beginning with the September 17, 2014, termination of the Slawson-EFP Gas Purchase Contract and thereafter, SEIF and U.S. Energy demanded that the contract be reinstated. They also attempted unsuccessfully to market the Pipeline over the course of nearly a year, while seeking to restore the dedication of the Slawson/Stephens production to the Pipeline.

On August 13, 2015, SEIF notified Slawson and Alameda that it would not be able to close under the original MIPA terms due to: 1) Stephens and Slawson refusing to rededicate production to the Pipeline; 2) the Pipeline being substantially reduced in value due to termination of the previously-dedicated production; and 3) Stephens representing in August 2015 that it had no further interest in purchasing the membership interests of Alameda and MBI. Based on the latter representation, U.S. Energy allegedly understood there would be no sale of Alameda's and MBI's interests.

On or around September 25, 2015, Stephens and Slawson settled the lawsuit with EFP by paying EFP substantial sums and by entering into various agreements "which effectively restored Nemaha Gas to the conditions that existed when SEIF first gave notice" that it would exercise its Right of First Refusal. This allegedly included a formal rededication of the Slawson/Stephens production to the Pipeline.

On September 25, 2015, Alameda purportedly sold its 51% membership interest in Nemaha Gas to Stephens. On October 1, 2015, MBI sold its 5% interest to Stephens. Also on October 1, 2015, Slawson resigned as Nemaha Gas Pipeline Operator and assigned operations to Stephens as purported majority membership owner. Since then, Stephens has purported to act as Pipeline Operator.

7

On October 23, 2015, SEIF sent a letter to Stephens disputing Stephens' assertion that it acquired a membership interest in accordance with the Operating Agreement. SEIF alleges that it is the only non-defaulting member of Nemaha Gas and that it has notified defendants of its decision to designate U.S. Energy as Pipeline Operator. It further alleges that Alameda has refused to return the $500,000 earnest money deposit on its Right of First Refusal.

SEIF's complaint alleges the following claims. Count 1 alleges that all of the defendants violated the Racketeering Influenced and Corrupt Organizations Act (RICO), by forming an enterprise to engage in a pattern of racketeering activity through mail and wire fraud. Count 2 alleges a RICO conspiracy by all defendants. Counts 3 and 4 allege breaches of contract by Alameda and MBI, while Counts 5 and 6 allege breaches of fiduciary duty by the same defendants. Counts 7 and 8 allege tortious interference with contracts by Stephens, while Count 9 alleges that Stephens tortuously interfered with a prospective business relationship. Similar claims are alleged against defendant Slawson in Counts 10, 11, and 12. Count 13 alleges breaches of agency duties by Slawson. Count 14 alleges a civil conspiracy by all defendants. Counts 15 through 18 assert rights to various forms of relief including a declaratory judgment, an accounting, and injunctive relief.

**<u>Standards Governing Motion to Dismiss</u>**.

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Upon such motion, the court must decide "whether the complaint contains

'enough facts to state a claim to relief that is plausible on its face.' " *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct. *Iqbal*, 566 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of the claims as well as the grounds upon which each claim rests. *See Robbins v. Okla.*, 519 F.3d 1242, 1248 (10th Cir. 2008) (internal citations omitted); *Parks v. Kiewel*, No. 6:15-1196-JTM-GEB, 2015 WL 7295457, at *7 (D. Kan. Nov. 18, 2015).

<u>**Slawson and Alameda Motion to Dismiss**</u> **(Dkt. 21).**

<u>1. RICO claims - Counts 1 and 2</u>. RICO is founded on the concept of racketeering activity. *RJR Nabisco, Inc. v. European Community*, ___S.Ct.___, 2016 WL 3369423, *4 (2016). Racketeering activity is defined by statute to encompass dozens of state and federal offenses known as predicates, including specified acts that are "indictable" under federal law such as mail fraud and wire fraud. *Id.*; 18 U.S.C. § 1961(1)(B). "A predicate offense implicates RICO when it is part of a 'pattern of racketeering activity' – a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabisco*, 2016 WL 3369423, *4. Section 1962(c) makes it unlawful for any person associated with an enterprise engaged in interstate commerce to participate in the enterprise's affairs through a pattern of racketeering activity. Section 1962(d) makes it unlawful for any person to conspire to do so. Section 1964

9

provides civil remedies, including treble damages, attorney's fees, and injunctive relief, for any person who suffers injury to business or property as a result of a RICO violation.

Count 1 of SEIF's complaint alleges that all of the defendants violated RICO by forming an enterprise to engage in a pattern of racketeering activity consisting of mail and wire fraud. Count 2 alleges a conspiracy to do such acts. Slawson and Alameda argue that the claims fail because SEIF fails to allege sufficient facts to show an enterprise, racketeering activity (mail or wire fraud), or a pattern of racketeering activity.

*Enterprise*. An "enterprise" under RICO includes any group of persons or entities associated together for a common purpose of engaging in a course of conduct. *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such an organization-in-fact need not have a hierarchical structure, fixed roles for its members, or other business-like attributes. *Boyle v. United States*, 556 U.S. 938 (2009). But it must have at least three structural features: a purpose, relationships among those associated with it, and longevity sufficient to permit those associates to pursue the enterprise's purpose. *Id*. at 946.

SEIF's complaint plausibly alleges the existence of a RICO enterprise. Read as a whole, the complaint alleges that the defendants associated together, for more than a year, to achieve a common purpose of defeating SEIF's attempted purchase of Alameda's and MBI's interests, and to instead bring about the sale of those interests to Stephens. The complaint further describes the alleged relationship between the members of the alleged enterprise. In arguing that SEIF fails to allege an enterprise,

10

defendants rely upon a narrow set of elements from *United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005). But in *Boyle, supra*, "the Supreme Court rejected *Smith's* narrow construction of what constitutes an association-in-fact enterprise." *United States v. Harris*, 695 F.3d 1125, 1135 (10th Cir. 2012). SEIF's allegations are sufficient to allege that there was an enterprise as defined by *Boyle*.

*Racketeering activity.* SEIF alleges that all of the defendants engaged in racketeering "through mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343." Dkt. 1 at 20. The complaint lists a series of events apparently intended to show these violations. *Id.* at 20-23.

The court agrees with defendants that SEIF's complaint fails to adequately allege acts of mail or wire fraud. The offense of wire fraud requires proof of: 1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises; 2) an intent to defraud; and 3) use of interstate wire or radio communications to execute the scheme. *United States v. Zander*, 794 F.3d 1220, 1230 (10th Cir. 2015). The offense of mail fraud is identical except that it requires use of the mails to execute the scheme. *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003). Because these offenses involve fraud, the party alleging them "must state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b); *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). Thus, a complaint alleging mail and wire fraud claims must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof," as well identifying "the purpose of the mailing within the defendant's fraudulent scheme." *Id.*

SEIF's complaint contains none of these requisites. It contains only vague references to "numerous telephone conversations, emails and letters," between unidentified "representatives of" the parties, on unknown dates and with unknown content, during which Slawson and Stephens allegedly did not disclose their intent to cancel the Slawson-EFP Gas Purchase Contract. These allegations do not come close to stating a claim for mail or wire fraud. No time, place, or content is given; no particular use of wire communications or the mails is cited; no date is given for any such act; and no allegation is made regarding defendants' state of mind or when they formed an intent to cancel the Gas Purchase Contract. The complaint does not describe the circumstances constituting fraud with particularity. The alleged fraud is apparently based on a pure omission rather than a misrepresentation, but the source of the duty to disclose on the part of the various defendants is not set forth. *See United States v. Sharp*, 749 F.3d 1267, 1280 (10th Cir. 2014) ("when an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak"). The complaint alleges that Alameda and MBI knew of the cancellation and "concealed" it, but that allegation is not connected to any mailing, email or phone call, it is not pinpointed in time, and the act of concealment is not explained. In sum, the complaint fails to allege racketeering activity and fails to state a claim for relief under RICO.

*Pattern of racketeering activity.*   A pattern of racketeering activity is a series of related predicates that together demonstrate the existence or threat of continued criminal activity. *RJR Nabisco, Inc.*, 2016 WL 3369423, *4. Given the complaint's failure to

adequately allege predicate acts under RICO, the court cannot ascertain whether those acts constitute a pattern of racketeering activity.

*Count 2.* Count 2 alleges that the defendants conspired to participate in the alleged enterprise and agreed that someone "would commit at least two of the racketeering acts identified" in Count 1. Because Count 1 fails to adequately plead racketeering acts, however, the court concludes that Count 2 likewise fails to state a valid claim for relief.

2. Breach of contract claim against Alameda – Count 3.   Count 3 alleges that Alameda breached the Nemaha Gas Operating Agreement by "acquiescing or assisting in the termination" of the Slawson-EFP Gas Purchase Contract without unanimous consent of the Members, and by selling and transferring its interest in Nemaha Gas without SEIF's consent, contrary to SEIF's Right of First Refusal. Dkt. 1 at 25.  Alameda contends the claim should be dismissed because: 1) the allegation that Alameda "acquiesce[ed] or assist[ed]" in termination of the Gas Purchase Contract fails to meet *Twombly/Iqbal* pleading standards; 2) Nemaha Gas was not a party to the Slawson-EFP contract and its cancellation therefore did not breach the Nemaha Gas Operating Agreement; and 3) no breach is shown because Alameda sold its interest only after SEIF gave notice that it would not close on its Right of First Refusal.

The court concludes that the complaint states a valid claim for breach of contract against Alameda (and MBI). Among other things, SEIF alleges that Alameda represented in the MIPA that there had been no adverse changes in Nemaha Gas's condition or prospects. Yet according to the complaint, Alameda assisted in Slawson's

and Stephens' cancellation of the Slawson-EFP Gas Purchase Agreement, which had a detrimental effect on the value of the pipeline and on the prospects of Nemaha Gas. Alameda then allegedly concealed the cancellation from SEIF, which only learned of it shortly before the scheduled closing date. SEIF alleges that all of this was knowingly done for the purpose of preventing it from exercising its Right of First Refusal and to provide a pretext for Alameda to retain SEIF's $500,000 earnest money deposit.

Kansas law implies a duty of good faith and fair dealing in contracts, pursuant to which a party represents that it "will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250 (2013).  SEIF's allegations state a claim for breach of contract under such a theory. At the same time Alameda was contractually representing that Nemaha Gas had suffered no detriment to its conditions or prospects, Alameda allegedly knowingly assisted in termination of the Gas Purchase Contract, which had a detrimental effect on the value of Nemaha Gas. These allegations are sufficiently clear and plausible to show a breach of the duty of good faith. The fact that Alameda was not a party to the Gas Purchase Contract is immaterial; the obligation allegedly breached was part of the Nemaha Gas Operating Agreement and the related MIPA, to which Alameda was a party. Finally, the fact that SEIF was informed of the contract's cancellation shortly before the scheduled closing date does not negate the claim. SEIF alleges, and may be able to show, that it was effectively prevented from exercising its option due to the

14

cancellation's detrimental effect on the value of the Nemaha Gas Pipeline – a detrimental effect that was remedied only after SEIF announced it would be unable to exercise its option and just in time for Alameda's sale of its interest to Stephens.  In sum, the court finds that the complaint plausibly states a valid claim for breach of contract against Alameda.

3. <u>Breach of fiduciary duty claim against Alameda – Count 5</u>. Alameda similarly moves to dismiss this claim because: 1) Alameda was not a party to the Slawson-EFP Gas Purchase Agreement, and 2) it claims Alameda could not have breached a fiduciary duty because SEIF chose not to exercise its Right of First Refusal and the Operating Agreement allowed a Member to sell its interest if the other Members declined to purchase it.

These arguments are unavailing. As indicated above, the fact that Alameda was not a party to the Slawson-EFP Gas Purchase Contract is immaterial. The fiduciary duty allegedly breached arose under the Nemaha Gas Operating Agreement. As for Alameda's argument that SEIF "voluntarily chose not to close" on its Right of First Refusal, that argument ignores the allegation that Alameda and others knowingly diminished the value or prospects of Nemaha Gas to effectively prevent SEIF from exercising its Right of First Refusal, with the value being restored only after SEIF was economically coerced into foregoing its intended purchase. Such allegations, if proven, would constitute a breach of fiduciary duty. *Cf. Amoco Prod. Co. v. Charles B. Wilson, Jr., Inc.*, 266 Kan. 1084, 1099, 976 P.2d 941, 952 (1999) ("Parties entering into agreements for joint development of mineral properties must be aware that they may well be stepping

into a new and different world – the world of the fiduciary – where traditional mining concepts of competition, hard bargaining, and jealous guarding of information are replaced with probate court principles of loyalty, acting for another's benefit and full disclosure.") (citation omitted). Alameda's assertion that a fiduciary duty could not require it to favor SEIF's interests over its own (Dkt. 36 at 7) misses the mark. The Right of First Refusal meant Alameda was required to offer its interest to SEIF on the same terms as the offer from Stephens. If, as SEIF alleges, Alameda placed a thumb on the scale by helping to diminish Nemaha Gas's value and thereby obstruct a sale to SEIF, such conduct could reasonably be found to be a breach of fiduciary duty.

4. <u>Tortious interference with contract against Slawson – Counts 11 and 12</u>. In Count 11, SEIF claims that Slawson tortiously interfered with the Nemaha Gas Operating Agreement by aiding and assisting Stephens in canceling the related Gas Purchase Agreement, and thereby "nullifying the EFP-Nemaha Gas Gathering Agreement," and by inducing Alameda and MBI to acquiesce in these actions, all without justification. Count 12 similarly alleges that Slawson procured breaches of the Nemaha Gas Operating Agreement to defeat SEIF's exercise of its Right of First Refusal.

Slawson contends these counts fail because they do not allege that Slawson induced a third party to breach any contract between plaintiff and the third party. It points out that neither SEIF nor Nemaha Gas was a party to the Slawson-EFP contract canceled by Slawson. It also argues that SEIF's choice to forego its Right of First Refusal means SEIF abandoned any rights under that provision. The court rejects the latter argument, however, for the same reasons previously stated.

16

As to the former argument, the court concludes the allegations are sufficient to withstand a motion to dismiss. For reasons discussed infra, the court first finds that New York law governs SEIF's tortious interference claims. The elements of tortious interference with a contract under New York law are: 1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff. *Hersh v. Cohen*, 131 A.D.3d 1117, 1119, 16 N.Y.S.3d 606, 609 (N.Y. App. Div. 2015).

These counts fairly allege that Slawson interfered with SEIF's contractual Right of First Refusal by rendering SEIF's own performance of that agreement practically impossible. "When a defendant improperly interferes with the plaintiff's own performance of a contract with another, the plaintiff's performance can become more costly…. In such cases, the Restatement § 766A provides that the plaintiff can recover for the improper interference." Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts*, § 634 (West 2d Ed.) (*citing* Restatement Second of Torts § 766A (1979)). In this case, Slawson allegedly made SEIF's purchase uneconomical by impairing the assets and prospects of Nemaha Gas. This alleged interference with SEIF's exercise of its Right of First Refusal, and Slawson's alleged inducement to Alameda and MBI to assist in that obstruction, all by improper means, could support a claim for relief.

5. Tortious interference with prospective business claim against Slawson – Count 10. SEIF alleges that Slawson knowingly interfered with a prospective business relationship, namely SEIF's prospective sale of its membership interest to a third-party

purchaser. Slawson claims this count fails because its conduct relating to the Gas Purchase Agreement did not violate the Nemaha Gas Operating Agreement. The court has already rejected that argument. Slawson also argues the claim is deficient because it does not allege that Slawson took any action directed at the third party purchaser.

The court determines that New York law applies to this claim. SEIF appears to concede as much in another response. *See* Dkt. 30 at 24. A federal court exercising supplemental jurisdiction over state law claims in a federal question suit applies the substantive law, including choice of law rules, of the forum state. *BancOklahoma Mtg. Corp. v. Cap. Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999). "In Kansas, tortious interference claims and defamation claims are governed by the law of the state where the wrong was felt." *Energy Consumption Auditing Servcs., LLC v. Brightergy, LLC,* 49 F.Supp.3d 890, 894 (D. Kan. 2014). That means applying the law of the state where the plaintiff felt the financial injury. *Id.* (*citing, inter alia, Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731, 735 (1985)). SEIF is a Delaware limited partnership with its principal place of business is in New York. Its general partner, U.S. Energy, is a New York corporation with its principal place of business in New York. Because SEIF's alleged financial injury would be principally felt in New York, the court concludes that New York provides the substantive law governing this claim.

SEIF concedes (Dkt. 30 at 24) that under New York law, SEIF "would need to show that Stephens communicated with or directed conduct at the third parties with whom SEIF was negotiating…." *Id.* The complaint makes no such allegation.

18

Accordingly, the court concludes that the motion to dismiss this claim should be granted.

6. <u>Breach of agency duties by Slawson – Count 13</u>. Slawson argues this claim fails because the duties allegedly violated by Slawson were owed to Nemaha Gas, not to SEIF. But the Nemaha Gas Operating Agreement provided in part: "Neither the Operator nor any Affiliate or agent of Operator shall be liable, responsible or accountable in damages … to the Company or the Members for any action taken, or failure to act, on behalf of Company *except to the extent caused by the Operator's gross negligence or willful misconduct or fraud*." (Emphasis added). By its terms the Agreement allows Slawson to be held liable to a Member for damages caused by Slawson's gross negligence, willful misconduct, or fraud. Additionally, as SEIF points out, Kansas law provides that a limited liability company agreement "may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." K.S.A. § 17-76,134. Inasmuch as SEIF has alleged that Slawson violated the duty of good faith and fair dealing, and that its conduct was intended to interfere with SEIF's exercise of its rights under the Operating Agreement, the court finds that SEIF's allegations state a valid claim for breach of agency duties by Slawson.

7. <u>Civil conspiracy claim against all defendants – Count 14</u>. The court agrees with defendants' contentions that SEIF's conspiracy allegations are stated in conclusory terms. This claim contains no dates, times, or identification of persons, no specification of acts performed by any individual defendant, and no showing that all of the

defendants acted in concert. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-67 (2007) (conclusory allegations of conspiracy will not suffice); *Canfield v. Douglas County*, 619 F. App'x. 774, 778 (10th Cir. 2015) (claim must show it is plausible that all the defendants entered into a common agreement, as opposed to engaging in parallel conduct).

8. Requests for declaratory relief, injunctive relief, and accounting – Counts 15, 16, and 17. Defendants argue SEIF has stated no valid claims and the above counts seeking equitable relief should therefore be dismissed. But because the court finds that SEIF has stated some valid claims, it rejects the motion to dismiss the counts seeking equitable relief.

## **Stephens Motion to Dismiss (Dkt. 23).**

1. RICO claims – Counts 1 and 2. The court finds that the motion to dismiss the RICO claims should be granted for the reasons previously stated.

2. Tortious interference with contract by Stephens – Counts 7 and 8. SEIF alleges that Stephens wrongfully interfered with the Nemaha Gas Operating Agreement, and with SEIF's Right of First Refusal under that agreement, by inducing Slawson to terminate the Slawson-EFP Gas Purchase Agreement, and by inducing Alameda and MBI to sell their interests to Stephens in violation of SEIF's Right of First Refusal.

For essentially the same reasons stated with respect to Slawson's motion, the court finds that SEIF has stated a valid claim for relief on these counts. The fact that neither Stephens nor SEIF was a party to the Gas Purchase Contract does not negate the claim, which is based on Stephens' wrongful interference with SEIF's rights under the Nemaha Gas Operating Agreement. Nor does the fact that Slawson was designated an

agent (Pipeline Operator) rather than a formal party to the Operating Agreement preclude the claim, given the obligations that Slawson had under the agreement. *See The Law of Torts*, supra, § 631 (Liability may be imposed for intentional interference with any kind of enforceable contract; inducing a breach of fiduciary duty falls under the same rule). Wrongfully inducing Slawson to breach the duties it owed to SEIF (and to Nemaha Gas) under the Operating Agreement, for the alleged purpose of defeating SEIF's exercise of its Right of First Refusal, could provide a valid basis for relief. Similarly, the complaint's allegations that Stephens induced Alameda and MBI to breach their obligations to SEIF under the Right of First Refusal state a valid claim for relief. *See* Restatement Second of Torts § 766 (1979) ("One who intentionally and improperly interferes with the performance of a contract … between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting … from the failure of the third person to perform the contract").

3. <u>Tortious interference with prospective business claim against Stephens – Count 9</u>. For the reasons previously indicated with respect to Count 10, the court finds this claim should be dismissed. Under the governing New York law, the absence of any allegation that Stephens communicated with or directed its conduct at the third parties with whom SEIF was negotiating is fatal to the claim.

4. <u>Conspiracy claim – Count 14</u>. This claim is dismissed for the reasons previously indicated.

5. <u>Claims for declaratory relief, injunctive relief, and an accounting – Counts 15, 16, and 17</u>. For the reasons previously indicated, the motion to dismiss these claims is denied. With respect to SEIF's request for an accounting, the court rejects Stephens' argument that the absence of any contractual right to an accounting under the Operating Agreement is dispositive of this claim. The equitable remedy of an accounting may be available when there is no adequate remedy at law and the accounts between parties are such that only an accounting can unravel them. *See Jordan v. Unif. Govt. of Wyandotte Co.*, 100 F.Supp.3d 1111, 1120 (D. Kan. 2015). Stephens has not shown that such a remedy is precluded as a matter of law.

## MBI Motion to Dismiss (Dkt. 25).

MBI's motion seeks dismissal of Counts 1, 2, 4, 6, 14, and 15, by adopting the same arguments asserted by the other defendants. Dkt. 26 at 1-3. The court adopts the same ruling with respect to these counts as indicated by the above discussion.

**IT IS THEREFORE ORDERED** this 18th day of August, 2016, that the motions to dismiss of defendants Alameda and Slawson (Dkt. 21), Stephens (Dkt. 23), and MBI (Dkt. 25) are GRANTED IN PART and DENIED IN PART as set forth in this order. Pursuant to the court's ruling, counts 1, 2, 9, 10 and 14 of the complaint are dismissed for failure to state a claim upon which relief can be granted.

<u>s/ J. Thomas Marten</u>
J. THOMAS MARTEN, JUDGE